2007 UT 56

Jordan GLEW, Maureen Glew, James R. Nichol, and Joan P. Nichol, Plaintiffs, Counterclaim Defendants, and Appellees,

Superior Title Company of Utah, Additional Counterclaim Defendant,

v.

OHIO SAVINGS BANK, Defendant, Counterclaimant, Third–Party Plaintiff, and Appellant,

v.

Metro National Title Company, Third–Party Defendant.

No. 20051092.

Supreme Court of Utah.

July 17, 2007.

Rehearing Granted Nov. 7, 2007.

Supplementing Opinion on Rehearing Feb. 22, 2008.

Richard A. Rappaport, Leslie Van Frank, Thomas J. Burns, Salt Lake City, for plaintiffs.

George A. Hunt, Salt Lake City, for defendant.

NEHRING, Justice:

## INTRODUCTION

¶ 1 In this appeal, Ohio Savings Bank challenges the outcome of a bench trial. Ohio Savings claims that it, as the holder of a $271,000 bridge loan note, was entitled to full payment of the note despite the fact that the makers of the note, James and Joan Nichol, had already directed the payoff proceeds to the soon-to-be-bankrupt FirstPlus Financial, Inc., which had transferred the note to Ohio Savings after originating it. The trial court, however, ruled that the doctrines of equitable estoppel and apparent authority provided legal justification for the Nichols' decision to pay FirstPlus. We affirm.

## BACKGROUND

¶ 2 When the Nichols bought their Sandy, Utah home, they had not yet found a buyer for the home in which they then resided. Like many homebuyers, the Nichols anticipated financing much of the purchase price of their new home with the proceeds from the sale of their prior residence. Because the Nichols could not realize these proceeds until their home was sold, they acquired a bridge loan from FirstPlus for $271,000 (Bridge Loan Note). To secure the Bridge Loan Note, the Nichols granted, in favor of FirstPlus, a trust deed on the home from which they were moving. With the funds from the Bridge Loan Note, the Nichols completed the purchase of their new home. FirstPlus also provided the financing for a first mortgage on their new home in the form of a thirty-year note (Thirty-Year Note) secured by a trust deed on the new home. The Nichols executed the notes and trust deeds for the Thirty-Year Note and the Bridge Loan Note at the closing on their new home held on July 14, 1998. At the closing, First-Plus also executed, in favor of Ohio Savings, assignments of the trust deeds that secured the Bridge Loan Note and the Thirty-Year Note. Ohio Savings is a secondary market lender, which routinely purchases loans from correspondent lenders, like FirstPlus, throughout the country. The assignments

were recorded with the Salt Lake County Recorder's office on August 4, 1998.

¶ 3 FirstPlus gave the Nichols several notices that explained how the assignments to Ohio Savings affected the Nichols. First, FirstPlus provided the Nichols letters advising them that Ohio Savings would be servicing both of the loans. The letters mandated that all inquiries about the loans be made by reference to the loan number. Each letter contained a space designated for the appearance of the Ohio Savings loan number. The spaces were blank.

¶ 4 Second, the Nichols received a "Notice of Assignment, Sale or Transfer of Servicing Rights" for each loan. Both notices contained the representation that

> [d]uring the 60–day period following the effective date of the transfer of loan servicing, a loan payment received by the original mortgage lender in a timely fashion may not be treated by the new loan servicer as late, and a late fee may not be imposed.

However, the notices for the two loans differed in one respect: the notice for the Bridge Loan Note stated that the transfer date to Ohio Savings was September 1, 1999, while the transfer date for the Thirty–Year Note was September 1, 1998.

¶ 5 In addition, the Nichols received disclosure documents for each loan, which similarly explained that a payment made to the original servicer within sixty days of the effective date of transfer of loan servicing would not be treated as late by the new servicer.

¶ 6 After the closing, Ohio Savings apparently discovered the date error in the Bridge Loan Note transfer date and requested that payment be directed to it under the assignment commencing September 1, 1998. It returned the Bridge Loan Note and the first of the three notifications—the one providing that Ohio Savings would be servicing the loan—to FirstPlus on August 21, 1998, so that FirstPlus could obtain the Nichols' signatures to amend the documents. The Nich-

ols complied with the request to amend the transfer date, and Ohio Savings received the signed amended documents on September 15.

¶ 7 Around the first of September, Mrs. Nichol began efforts to make her first payment on the Thirty–Year Note. Under the terms of the notices the Nichols had received concerning the assignment of the loan to Ohio Savings, the Nichols were to begin sending payments to Ohio Savings in September. Mrs. Nichol began her inquiries into where to direct her payment because Ohio Savings had yet to provide the Nichols with a loan number. Mrs. Nichol called Ohio Savings' toll-free telephone number several times in an attempt to obtain a loan number, but she was unsuccessful. Ohio Savings representatives repeatedly told her not to send any money without a loan number. On September 16, 1998, an Ohio Savings representative told Mrs. Nichol not to send a payment without a loan number and that she should contact FirstPlus and make the payment to it. On that same day, Mrs. Nichol sent FirstPlus a payment on the Thirty–Year Note.

¶ 8 During the summer of 1998, the Nichols found a buyer for their prior home. A closing on the sale was scheduled for September 17, 1998, at Metro National Title Company. The Bridge Loan Note was to be paid off at the closing. On September 3, 1998, Metro National faxed a payoff request signed by Mrs. Nichol to Ohio Savings that made reference to the fast-approaching closing date. Following up on the payoff request, Metro National's representative, Aaron Turner, called Ohio Savings. He was told that the loan was not in Ohio Savings' computer system and that Ohio Savings could not help him. Mr. Turner pressed the issue, insisting that the loan was with Ohio Savings and asked to speak with a supervisor. A person then came to the phone, identified himself as a manager, and told Mr. Turner that Ohio Savings could not provide a payoff statement and that he should contact First-Plus.[1]

---

1. Ohio Savings contends that the trial court erred when it found that Ohio Savings expressly instructed Metro National and the Nichols to pay FirstPlus. Ohio Savings observes, plausibly, that

since Ohio Savings does business with many loan originators, it would have been unlikely that the Ohio Savings representative would have independent knowledge that FirstPlus was the originator

¶ 9 As the closing date approached, Metro National asked Mrs. Nichol to renew her attempt to obtain the payoff information from Ohio Savings. Mrs. Nichol called Ohio Savings on September 14 and was again told that Ohio Savings did not have the loan, that she should not send any money to Ohio Savings without a loan number, and that she should deal with the original lender. Mrs. Nichol told Metro National's escrow officer about her conversation with Ohio Savings, saying that Ohio Savings had told her to make the payoff to FirstPlus.

¶ 10 On September 17, Metro National contacted FirstPlus and requested a payoff statement for the Bridge Loan Note. First-Plus complied and faxed the statement to Metro National.

¶ 11 The trial court found that, taken together, these events warranted Metro National and the Nichols' reliance and justified them in directing the payoff for the Bridge Loan Note to FirstPlus.

¶ 12 The closing on the sale of the Nichols' previous home took place as scheduled on September 17, 1998. On September 18, 1998, Metro National sent the bridge loan payoff check to FirstPlus and requested release of the trust deed that secured the Bridge Loan Note.

¶ 13 On either September 17 or 18, 1998, Ohio Savings wired funds to FirstPlus to complete the purchase of the Thirty–Year Note and the Bridge Loan Note. The Thirty–Year Note and the Bridge Loan Note became active in Ohio Savings' servicing computer on September 21, 1998. Sometime after that date, Ohio Savings sent the Nichols a letter containing a loan number for the Thirty–Year Note and advising them that their first payment to Ohio Savings would come due on November 1, 1998. At the same time, the Nichols received a similar letter from Ohio Savings providing them with the loan number for the Bridge Loan Note.

¶ 14 Despite receiving payment from Ohio Savings for the Bridge Loan Note, FirstPlus did not forward Ohio Savings the final payment of the loan made by the Nichols. Instead, it kept the money and filed for bankruptcy.

¶ 15 Ohio Savings commenced a nonjudicial foreclosure of the trust deed on the Bridge Loan Note against the Nichols' former home, which had been bought by Jordan and Maureen Glew. The Glews demanded that Ohio Savings release the trust deed on the Glew home from the Bridge Loan Note. Ohio Savings refused, and the Glews and the Nichols sued.

¶ 16 After a bench trial, the trial court entered extensive findings of fact and conclusions of law. The court concluded that, under the doctrines of apparent authority and equitable estoppel, Ohio Savings was estopped from arguing that the check the Nichols sent to FirstPlus did not pay the Bridge Loan Note in full.

¶ 17 The trial court anchored its ruling that Ohio Savings was equitably estopped from asserting that the Nichols were obligated to pay it instead of FirstPlus in numerous factual findings. As noted above, the court found that when Metro Title and the Nichols contacted Ohio Savings to inquire about paying off the Bridge Loan Note, Ohio Savings directed the Nichols to FirstPlus. The trial court also found that it was reasonable for the Nichols to rely on these representations and on the written statements provided at the closing in making the payoff to FirstPlus. The trial court linked its determination that Ohio Savings ceded apparent authority to FirstPlus to receive the Nichols' payoff of the Bridge Loan Note to the communications among Metro Title, Mrs. Nichol, and Ohio Savings during which Ohio Savings directed Metro Title and Mrs. Nichol, either expressly or by implication, to direct the payoff to FirstPlus. The trial court also concluded that Ohio Savings was not a holder in due

of the Bridge Loan Note and that, therefore, Ohio Savings would have been unable to give instructions to pay FirstPlus. However, even if FirstPlus were not identified by name in any of the conversations with Ohio Savings, from the point of view of Metro National and the Nichols, there was no other reasonable inference to be drawn from Ohio Savings' communication than that payment should be directed to FirstPlus. Given the obvious and inescapable nature of this inference, we see no reason to disturb the trial court's finding that Ohio Savings instructed the Nichols to pay FirstPlus.

course based on its finding that Ohio Savings did not pay FirstPlus for the Bridge Loan Note until after the Nichols tendered the payoff to FirstPlus. Accordingly, the court ordered Ohio Savings to release the trust deed. This appeal followed.

## STANDARD OF REVIEW

¶ 18 The trial court in this case acted as the fact-finder in the bench trial and offered a comprehensive array of factual findings in support of its equitable estoppel and apparent authority determinations. We will not disturb the court's findings of fact unless they are clearly erroneous. *Dep't of Human Servs. ex rel. Parker v. Irizarry*, 945 P.2d 676, 678 (Utah 1997) ("An appellate court 'will not reverse the findings of fact of a trial court sitting without a jury unless they are ... clearly erroneous.' " (quoting *MacKay v. Hardy*, 896 P.2d 626, 629 (Utah 1995))). Moreover, in those instances in which the trial court's findings include inferences drawn from the evidence, we will not take issue with those inferences unless the logic upon which their extrapolation from evidence is based is so flawed as to render the inference clearly erroneous. *State v. Walker*, 743 P.2d 191, 193 (Utah 1987) (" '[An appellate court] must give great weight to the findings made and the inferences drawn by the trial judge, but it must reject his findings if it considers them to be clearly erroneous.' " (quoting 25 Wright & Miller, *Federal Practice and Procedure* § 2585 (1971))).

2. Utah Code section 70A–3–301 (1998) provides:
   "Person entitled to enforce" an instrument means the holder of the instrument, a nonholder in possession of the instrument who has the rights of a holder, or a person not in possession of the instrument who is entitled to enforce the instrument pursuant to Section 70A–3–309 or Subsection 70A–3–418(4). A person may be a person entitled to enforce the instrument even though he is not the owner of the instrument or is in wrongful possession of the instrument.

3. Utah Code section 70A–3–602 (1998) provides:
   (1) Subject to Subsection (2), an instrument is paid to the extent payment is made by or on behalf of a party obliged to pay the instrument, and to a person entitled to enforce the instrument. To the extent of the payment, the obligation of the party obliged to pay the instru-

¶ 19 Also, the trial court's application of the equitable doctrines of estoppel and apparent authority to the facts of this case is a mixed question of law and fact of an extremely fact-sensitive nature to which we grant significant deference. We have previously explained that "the doctrine of equitable estoppel is simply stated, yet it is applicable to a wide variety of factual and legal situations. The variety of fact-intensive circumstances involved weighs heavily against lightly substituting our judgment for that of the trial court." *Irizarry*, 945 P.2d at 678 (citing *State v. Pena*, 869 P.2d 932, 939 (Utah 1994)). Similarly, the ruling that FirstPlus acted with the apparent authority of Ohio Savings deserves significant deference, as apparent authority, like equitable estoppel, can be created by a vast array and mix of facts. *See id.; see also State v. Levin*, 2006 UT 50, ¶ 24, 144 P.3d 1096 ("Discretion is broadest—and the standard of review is most deferential—when the application of a legal concept is highly fact dependant and variable."). We therefore grant broad deference to the trial court's decision that the facts adduced at trial satisfy the requirements of apparent authority and equitable estoppel.

## ANALYSIS

¶ 20 Ohio Savings opens its brief with an extensive discussion of the unforgiving nature of the payment rule as codified in Utah Code sections 70A–3–301 [2] and 70A–3–602(1) [3]. Ohio Savings outlines how the pay-

ment is discharged even though payment is made with knowledge of a claim to the instrument under Section 70A–3–306 by another person.
(2) The obligation of a party to pay the instrument is not discharged under Subsection (1) if:
   (a) a claim to the instrument under Section 70A–3–306 is enforceable against the party receiving payment, and:
   (i) payment is made with knowledge by the payor that payment is prohibited by injunction or similar process of a court of competent jurisdiction; or
   (ii) in the case of an instrument other than a cashier's check, teller's check, or certified check, the party making payment accepted, from the person having a claim to the instrument, indemnity against loss resulting from refusal to pay the person entitled to enforce the instrument; or

ment rule places the risk of loss squarely upon a payor in the event that he or she pays someone other than the holder of a note.

■■ ¶ 21 Ohio Savings' arguments based on the unforgiving nature of the payment rule were made moot, however, by the trial court's findings that the equitable doctrines of estoppel and apparent authority prevent Ohio Savings from foreclosing on the trust deed securing the Bridge Loan Note. Ohio Savings accurately conceded at oral argument that the payment rule does not trump equitable doctrines like estoppel and apparent authority. Ohio Savings' case, therefore, rises and falls on the sufficiency of the evidence supporting the trial court's application of the doctrines of equitable estoppel and apparent authority to the facts of this case.[4]

¶ 22 We will affirm a trial court's ruling against a sufficiency of the evidence challenge unless it is clearly erroneous. Utah R. Civ. P. 52(a); *see also S.B.D. v. State (State ex rel. Z.D.)*, 2006 UT 54, ¶ 40, 147 P.3d 401 (holding that for an appellate court to overturn factual findings made by a trial court, "[t]he result must be against the clear weight of the evidence or leave the appellate court with a firm and definite conviction that a mistake has been made").

■ ¶ 23 Ohio Savings contends that some of the trial court's subsidiary findings supporting its ultimate findings of equitable estoppel and apparent authority were clearly erroneous. It argues that it was error to make Ohio Savings suffer the loss in this case when its communications created, at most, an "unintentional inference" that the Nichols should pay off the Bridge Loan Note to FirstPlus instead of Ohio Savings. Intent is certainly relevant to equity. *See Parduhn v. Bennett*, 2005 UT 22, ¶ 41, 112 P.3d 495 (finding that the district court appropriately focused on the intent of the business partners in an equitable distribution case). But absence of intent will not immunize a party

from a determination that its conduct was inequitable. What matters is the reasonableness of the reliance placed on the conduct of the party against which estoppel is sought, not the mental state of the offending party. *See IHC Health Servs. v. D & K Mgmt., Inc.,* 2003 UT 5, ¶ 10, 73 P.3d 320 ("In order to prevail on a claim for equitable estoppel a party must show that the party to be estopped acted in such a way as to induce reasonable reliance by the other party and that allowing the first party to act contrary to its earlier actions would work to the detriment of the relying party.").

¶ 24 As our summary of the trial court's factual findings makes apparent, there is a constellation of communications which could, in many configurations, equitably estop Ohio Savings from looking to the Nichols for payment. We have little regard for the claimed misinterpretations and misapplications of these communications by the trial court. In the area of equitable estoppel and apparent authority, it matters little whether Ohio Savings expressly instructed the Nichols to pay FirstPlus or whether it merely insisted on multiple occasions that payment not be directed to it and that the Nichols should contact the originating lender for more information. In the context of the totality of the communications from Ohio Savings to the Nichols on the subject of payment, the trial court was on solid factual footing when it concluded that the Nichols reasonably relied on the Ohio Savings communications. Similarly, the trial court had support for its conclusion that it was unreasonable to expect the Nichols to obtain a payoff figure from FirstPlus only to pay Ohio Savings.

¶ 25 Our views on this point would not be altered even were we to find persuasive several of Ohio Savings' perceived flaws in the trial court's findings. Contrary to the trial court's finding, Ohio Savings may not have had a corporate practice to permit correspon-

---

(b) the person making payment knows that the instrument is a stolen instrument and pays a person it knows is in wrongful possession of the instrument.

4. The Nichols ask us to deny Ohio Savings' request that we review for sufficiency of the evidence because it failed to adequately marshal the

evidence. There is considerable appeal to this invitation. In this instance, however, we decline to affirm the trial court on those grounds. We are content to take up the merits of the sufficiency claim here because it is so clear that the great weight of the evidence supports the findings of the trial court.

dent lenders like FirstPlus to collect payments from lenders on its behalf. The presence or absence of such a practice was, as Ohio Savings reminds us, not something that would have been known to the Nichols before they paid FirstPlus. Because the Nichols were not aware of Ohio Savings' corporate practice regarding allowing payments to be made to correspondent lenders, an erroneous finding about the actual practice would not affect the reasonableness of the Nichols' reliance on the communications they received from Ohio Savings. The Nichols did what Ohio Savings told them to do, either through its express instructions or unambiguous inferences. Whether these instructions had also been consistent with Ohio Savings' business practices would have added little.

¶ 26 Similarly, the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601 through 2617 (RESPA), may not have applied to the Bridge Loan Note, and consequently, Ohio Savings may not have been required by law to treat as timely any payments made to the original servicer within sixty days of the effective date of the transfer of the loan. Ohio Savings nevertheless caused RESPA rights to be communicated to the Nichols for both the Thirty–Year Note and the Bridge Loan Note. It was not clearly erroneous for the trial court to find that it was the fact of the communication that mattered, not whether Ohio Savings had a legal obligation to make the communications. Further, Ohio Savings' argument that the Nichols should have known that the RESPA payment provisions applied only to monthly payments and not to the payoff of the outstanding balance of the note leaves us unmoved. There is nothing in the substance of the notice that would suggest that the payments made under its provisions had any dollar limit. It is only with the expenditure of considerable effort that we are able to pry from the text of the notice the inference that there may be some limit on the amount that the Nichols would be permitted to pay to FirstPlus within the first sixty days of the loan.

¶ 27 Nor are we troubled by the trial court's determination that it was not unreasonable to treat as one piece the communications from Ohio Savings relating to the Thirty–Year Note and the Bridge Loan Note. That Ohio Savings' identical messages concerning each loan may have had a mutually reinforcing effect on the degree of confidence the Nichols developed in the correctness of their decision to pay FirstPlus does not work to erode the reasonableness of their reliance on Ohio Savings' instructions directed solely to the Bridge Loan Note.

¶ 28 Based on our review of the record, we are convinced that the trial court's ruling was in line with the clear weight of the evidence. See Z.D., 2006 UT 54, ¶ 40, 147 P.3d 401. We therefore affirm the trial court's judgment in this matter.

¶ 29 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING'S opinion.

## ORDER GRANTING ATTORNEY FEES ON APPEAL

Appellees Jordan Glew, Maureen Glew, James R. Nichol, and Joan P. Nichol petitioned this court for rehearing of the appeal which resulted in the issuance of our decision in *Glew v. Ohio Savings Bank*, 2007 UT 56, 181 P.3d 791, on July 17, 2007. The appellees sought rehearing for the purpose of seeking an award of their attorney fees on appeal. Following the receipt of the appellees' petition, we called for a response from the appellant, Ohio Savings Bank, and sought supplemental briefing on the question presented in the appellees' petition.

▆▆▆ Although we conclude that an application for an award of attorney fees on appeal should be presented to this court by motion brought under rule 23 of the Utah Rules of Appellate Procedure instead of through a petition for rehearing, we concede that our rules do not give clear direction on this subject. The appellees have understandably construed our failure to address their request for fees on appeal in our opinion to be a matter of "overlooking" or "misapprehending" the issue. The availability of fees on appeal is, however, an issue that is in almost all instances ancillary to the issues to which the parties have devoted their energies and precious brief pages. The issue is never

an issue on appeal that can be expected to appear in a docketing statement under the requirements of rule 9(c)(7) of the Utah Rules of Appellate Procedure. We therefore elect to treat the appellees' petition for rehearing as a motion to award attorney fees on appeal.

By using the petition for rehearing to seek their fees, the appellees have unwittingly invited Ohio Savings to seek rehearing of the trial court's award of attorney fees, an issue it never challenged before. We summarily reject Ohio Savings' request that we take up the unpreserved issue of whether the trial court properly awarded the appellees their attorney fees on the basis of a claim that "exceptional circumstances" warrant review. Not only did Ohio Savings fail to take up the issue of attorney fees in any papers filed with the court before we issued our decision, it did not take note of the matter until we invited it to respond to the appellees' petition for rehearing.

We also reject Ohio Savings' contention that the appellees are ineligible for an award of fees on appeal because our decision affirmed the appellees' victory on its claim of equitable estoppel but declined to reach other grounds. According to Ohio Savings, an equitable resolution cannot support a fee award. This claim lacks merit. The trial court determined that Ohio Savings was equitably estopped from asserting that the appellees, specifically Mr. and Mrs. Nichol, breached their contract. As we have recently noted, equitable estoppel may be used to justify "modify[ing] a contract or prevent[ing] a party from denying the validity of contract when one party has relied on another party's conduct." *Swan Creek Vill. Homeowners Ass'n v. Warne*, 2006 UT 22, ¶ 35, 134 P.3d 1122. The equitable relief awarded the appellees was not a substitute for relief under a contract, but rather provided the rationale for awarding relief based squarely on a contract.

Therefore, consistent with our settled view that a party who received an award of attorney fees below is entitled to their fees on appeal, we grant the appellees' application for fees and remand for determination of the reasonable amount of attorney fees to be awarded.