**2020 UT App 122**

## THE UTAH COURT OF APPEALS

BAD ASS COFFEE COMPANY OF HAWAII INC.,
Appellant and Cross-appellee,

*v.*

ROYAL ALOHA INTERNATIONAL LLC
AND FRANCOUNSEL GROUP LLC,
Appellees and Cross-appellants.

Opinion
No. 20190181-CA
Filed August 20, 2020

Third District Court, Salt Lake Department
The Honorable Barry G. Lawrence
No. 130906130

Blake T. Ostler, Attorney for Appellant
and Cross-appellee

Joshua R. Furman, Amy F. Sorenson, and Tanya N.
Lewis, Attorneys for Appellees and Cross-appellants

JUDGE JILL M. POHLMAN authored this Opinion, in which
JUDGES GREGORY K. ORME and DIANA HAGEN concurred.

POHLMAN, Judge:

¶1     Following negotiations in 2011, Bad Ass Coffee Company of Hawaii Inc. (BACH) and FranCounsel Group LLC (FranCounsel) entered into an operating agreement (the Operating Agreement) to form Royal Aloha International LLC (Royal) as well as a license agreement (the License Agreement) for the purpose of developing BACH's international presence. The parties' relationship eventually deteriorated, and litigation ensued. After the completion of two phases of trial adjudicating BACH's claims related to both agreements and FranCounsel and Royal's counterclaims, BACH now appeals several of the district court's rulings regarding the validity of the agreements and the

supportability of the jury's damages verdict in FranCounsel's favor. For their part, Royal and FranCounsel cross-appeal the district court's denial of their request for attorney fees and costs under both agreements. We affirm.

BACKGROUND[1]

¶2     In 2011, BACH was looking to develop an international presence for its established coffee business. BACH—through its former president and director, Harold Hill—approached FranCounsel, an international franchise consultancy for help with that effort. Eventually, BACH and FranCounsel—through its owner, Bachir Mihoubi—agreed to form Royal, a new entity, to pursue BACH's international expansion.

¶3     Hill, on behalf of himself and BACH, and Mihoubi, on behalf of FranCounsel, executed the Operating Agreement for Royal. The Operating Agreement divided Royal's membership interests between BACH, FranCounsel, and Hill. Specifically, the Operating Agreement provided Hill a 25% personal membership interest, BACH a 25% interest, and FranCounsel the remaining 50% interest.

---

1. This case proceeded in two phases—a bench trial followed by a jury trial. "On appeal from a bench trial, we view the evidence in a light most favorable to the trial court's findings, and therefore recite the facts consistent with that standard." *Wood v. Salt Lake City Corp.*, 2016 UT App 112, ¶ 1 n.2, 374 P.3d 1080 (cleaned up). Similarly, "in reviewing a jury verdict, we view the evidence in the light most favorable to it, and recite the facts accordingly. We present conflicting evidence only to the extent necessary to understand the issues raised on appeal." *CDC Restoration & Constr. LC v. Tradesmen Contractors LLC*, 2016 UT App 43, n.1, 369 P.3d 452 (cleaned up).

¶4　As relevant to the issues raised on appeal, the Operating Agreement provided that FranCounsel's initial capital contribution would be "its time for the day-to-day management and the international franchise development," which had a "fair market value of approximately $500,000.00." It also included an indemnification provision for its members.

¶5　Following Royal's formation and the execution of the Operating Agreement, Hill and Mihoubi, on behalf of BACH and Royal respectively, executed the License Agreement. The agreement provided Royal rights to use and exploit BACH's franchise system, in exchange for which BACH received a 25% interest in Royal.

¶6　In 2013, BACH filed suit against FranCounsel and Royal (collectively, Appellees), alleging that through the Operating Agreement and the License Agreement, Appellees conspired to defraud BACH of the value of its international franchising rights. On this basis, BACH sought a declaration from the district court that the Operating Agreement and the License Agreement were void and unenforceable, estopping Appellees from asserting the validity of both agreements. In response, Appellees asserted several counterclaims against BACH, including breach of contract claims arising out of the License Agreement and the Operating Agreement.

¶7　The case was tried in two phases. The first phase was tried to the bench, where the district court adjudicated all BACH's claims in Appellees' favor. In particular, the court rejected BACH's arguments that Hill lacked authority to enter into the agreements on BACH's behalf and that Mihoubi had a duty to further investigate Hill's authority before entering into the agreements. Thus, the court ruled that the Operating Agreement and the License Agreement were valid and enforceable.

¶8　In the second phase, and following various rulings, only FranCounsel's breach of contract claim regarding the Operating

Agreement was tried to the jury. The jury was asked to determine whether BACH had breached the Operating Agreement and, if so, to set the amount of damages.

¶9     Regarding the amount of damages, in its initial disclosures FranCounsel claimed $2,000,000 in damages for lost profits, $500,000 for the reasonable value of its marketing and promotion work, and $500,000 for its lost capital investment in Royal. However, the only damages theory FranCounsel was allowed to present to the jury was one based on the $500,000 in-kind capital contribution identified in the Operating Agreement.[2]

¶10    The jury found that BACH had breached the Operating Agreement and awarded FranCounsel $100,000 in damages. BACH then filed a motion for judgment notwithstanding the verdict (the JNOV), arguing that the jury's damages award was not supported by the evidence. The district court denied the motion, reasoning that BACH had "failed to meet its burden of demonstrating" entitlement to relief.

¶11    Following the phase-two jury trial, Appellees filed a motion for attorney fees. Appellees cited provisions in both the Operating Agreement and the License Agreement, claiming that such provisions entitled them to recover all attorney fees they incurred in both phases of the case.[3] The court disagreed,

---

2. FranCounsel voluntarily withdrew its claims for damages based on lost profits before trial. The district court also concluded before trial that FranCounsel had failed to demonstrate that the claim for $500,000 based on the "Reasonable Value of marketing and promotion work" was viable.

3. Appellees also requested bad-faith attorney fees under Utah Code section 78B-5-825. The court denied Appellees' request, but Appellees do not seek review of that decision on appeal.

concluding that the cited provisions did not provide a basis for an attorney fees award. Accordingly, the court denied Appellees' request for fees.[4]

¶12    BACH appeals the district court's resolution of its claims in the first phase of this case, challenging the court's ruling regarding Hill's authority to enter into the Operating Agreement[5] and Mihoubi's alleged duty to have investigated such authority. BACH also appeals a range of decisions related to the damages awarded, including the court's denial of the JNOV. Appellees cross-appeal the court's denial of their request for attorney fees.

ISSUES AND STANDARDS OF REVIEW

¶13    BACH challenges the district court's ruling, following the phase-one bench trial, that the Operating Agreement is valid and enforceable. On appeal from a bench trial, "we review the court's legal conclusions for correction of error," and "we will not disturb the court's findings of fact unless they are clearly

---

4. The court granted in part Appellees' associated request under rule 54 of the Utah Rules of Civil Procedure for certain deposition and transcript costs but denied recoupment for copy costs. On appeal, Appellees generally contend that they are entitled to all their costs, but they do not specifically address the court's denial of their copy costs. Accordingly, we do not address the district court's denial of Appellees' copy costs under rule 54.

5. Although the court ultimately determined that Hill had authority to enter into both the License Agreement and the Operating Agreement on BACH's behalf, BACH appears to appeal the court's conclusions only with respect to Hill's authority for the Operating Agreement. We therefore similarly limit our analysis.

erroneous." *Hale v. Big H Constr. Inc.*, 2012 UT App 283, ¶ 13, 288 P.3d 1046 (cleaned up); *see also VT Holdings LLC v. My Investing Place LLC*, 2019 UT App 37, ¶ 17, 440 P.3d 767 ("On appeal from a bench trial, we review the findings of fact for clear error and give due regard to the district court's opportunity to judge the credibility of the witnesses." (cleaned up)).

¶14 BACH also challenges the damages award on three grounds. First, BACH claims that the district court erred by allowing FranCounsel's breach of contract claim to be tried because FranCounsel did not comply with the damages disclosure requirement under rule 26 of the Utah Rules of Civil Procedure. We review a district court's discovery decisions, including decisions about discovery sanctions, for abuse of discretion. *Bodell Constr. Co. v. Robbins*, 2009 UT 52, ¶ 16, 215 P.3d 933; *see also Thurston v. Workers Comp. Fund*, 2003 UT App 438, ¶ 11, 83 P.3d 391 ("Generally, the trial court is granted broad latitude in handling discovery matters, and we will not find abuse of discretion absent an erroneous conclusion of law or where there is no evidentiary basis for the trial court's rulings." (cleaned up)).[6]

¶15 Second, BACH argues that the court erred by allowing, through a summary judgment ruling, FranCounsel's damages to be based on the value of its capital contribution to Royal. Summary judgment is appropriate "if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). We "review a district court's legal conclusions and ultimate grant or denial of summary judgment for correctness, viewing the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Penunuri v.*

---

6. Although this rule 26 discovery issue was raised in the context of a motion for summary judgment, given the nature of the challenge, both parties agree that this issue should be reviewed under an abuse of discretion standard.

*Sundance Partners Ltd.*, 2017 UT 54, ¶ 14, 423 P.3d 1150 (cleaned up).

¶16 Finally, BACH challenges the sufficiency of the evidence supporting the damages award, arguing that the court erred by denying the JNOV and that there was no basis in the evidence to support the fact of damages or the amount. "On a motion for judgment notwithstanding the verdict, we will reverse the trial court's ruling only if, viewing the evidence in the light most favorable to the prevailing party, we conclude that the evidence is insufficient to support the verdict." *Pinney v. Carrera*, 2019 UT App 12, ¶ 33, 438 P.3d 902 (cleaned up), *aff'd*, 2020 UT 43.

¶17 In their cross-appeal, Appellees challenge the district court's denial of their request for attorney fees. "Whether attorney fees are recoverable is a question of law, which we review for correctness." *Fisher v. Davidhizar*, 2018 UT App 153, ¶ 9, 436 P.3d 123 (cleaned up).

ANALYSIS

I. BACH's Appeal

A.       The Enforceability of the Operating Agreement

¶18 BACH asks that we reverse the district court's conclusion that the Operating Agreement is valid and enforceable. Citing Mihoubi's purported knowledge about the circumstances surrounding the corporate opportunity Hill acquired through the Operating Agreement—a 25% interest in Royal—BACH claims that the court erred in concluding that Hill had the apparent authority to bind BACH to the agreement. BACH asks us to hold that the court erred in determining that Mihoubi had no obligation to further investigate Hill's authority to enter into the Operating Agreement in light of Mihoubi's alleged knowledge that Hill was personally benefiting from the transaction.

¶19    "Under agency law, an agent cannot make its principal responsible for the agent's actions unless the agent is acting pursuant to either actual or apparent authority." *Hussein v. UBS Bank USA*, 2019 UT App 100, ¶ 30, 446 P.3d 96 (cleaned up). "Apparent authority exists where the conduct of the principal causes a third party to reasonably believe that someone has authority to act on the principal's behalf, and the third party relies on this appearance of authority and will suffer loss if an agency relationship is not found." *Zions Gate R.V. Resort LLC v. Oliphant*, 2014 UT App 98, ¶ 11, 326 P.3d 118 (cleaned up); *see also Burdick v. Horner Townsend & Kent Inc.*, 2015 UT 8, ¶ 22, 345 P.3d 531 ("The authority of an agent is not 'apparent' merely because it looks so to the person with whom he deals, but rather it is the *principal* who must cause third parties to believe that the agent is clothed with apparent authority." (cleaned up)); *Grazer v. Jones*, 2012 UT 58, ¶ 11, 289 P.3d 437 ("Where the principal does something to support a third party's reasonable belief that the agent has the authority to act, that agent is vested with apparent authority to bind the principal.").

¶20    Importantly, "a belief that results solely from the statements or other conduct of the agent, unsupported by any manifestations traceable to the principal, does not create apparent authority." *Burdick*, 2015 UT 8, ¶ 22 (cleaned up); *see also Bergdorf v. Salmon Elec. Contractors Inc.*, 2019 UT App 128, ¶ 20, 447 P.3d 1265 ("[A]pparent authority cannot be premised on the manifestations of the purported agent."); *Hussein*, 2019 UT App 100, ¶ 35 ("Apparent authority can be inferred only from the acts and conduct of the principal." (cleaned up)). And "knowledge of an agent's lack of authority defeats a claim for apparent authority." *Zions Gate R.V. Resort*, 2014 UT App 98, ¶ 11 (cleaned up).

¶21    Additionally, a district court's apparent authority determination is entitled to significant deference. As our supreme court has explained, such determinations are "mixed question[s] of law and fact of an extremely fact-sensitive nature," and we therefore owe them "significant deference" because of

the "vast array and mix of facts" that can create apparent authority in the eyes of a third party. *Glew v. Ohio Sav. Bank*, 2007 UT 56, ¶ 19, 181 P.3d 791. This is so because apparent authority determinations are not made in a vacuum; they do not "lend [themselves] to consistent resolution by a uniform body of appellate precedent," as the "particular facts and circumstances . . . are likely to be so complex and varying that no rule adequately addressing the relevance of all these facts can be spelled out." *See In re adoption of Baby B.*, 2012 UT 35, ¶¶ 42–43, 308 P.3d 382 (cleaned up).

¶22 Here, the district court concluded that "Mihoubi reasonably and justifiably relied on Mr. Hill's apparent authority" "to enter into the Operating Agreement." To support this conclusion, the court determined that Mihoubi's reasonable reliance on Hill's authority was supported by various indicia of authority vis-à-vis BACH, the principal, and Mihoubi, the third party, including: "Hill's position as president, director, shareholder, and the 'face' of BACH"; "[t]he Corporate Resolution signed by [BACH's current director and only other board member] and provided by BACH to Mr. Mihoubi"; "[t]he fact that BACH had already made a provision for Mr. Hill or [the other board member with Hill] to receive a personal interest in the transactions with FranCounsel," which testimony suggested "was not unusual for BACH"; and a "provision in the draft agreement prepared by BACH's attorneys" that also showed "that an arrangement where a principal of BACH received a personal interest in a BACH transaction is typical of how BACH operated."

¶23 Significantly, the court also expressly determined that Mihoubi had no knowledge of any facts surrounding Hill's conflict of interest and self-dealing to draw into question Hill's authority to enter into the Operating Agreement on BACH's behalf. Rather, the court determined that the "appearance of a conflict of interest in the transaction [did] not change Mr. Hill's authority," finding that the evidence BACH offered about the formation of the Operating Agreement did not demonstrate a

"change in circumstances that would have impacted Mr. Hill's authority to negotiate for BACH."

¶24    It further found that Mihoubi's "conduct towards BACH on behalf of FranCounsel and Royal was at arms' length and shows only a reasonable, business-like approach to the transactions"; that Hill's "unauthorized conduct . . . was only the result of BACH's lack of corporate formalities, diligence, and oversight," and did "not implicate Mr. Mihoubi, FranCounsel, or Royal"; and that, given the indicia of Hill's authority to act on behalf of BACH, "Mihoubi was not required to do more," such as further investigate the "business relationship" between Hill and BACH.

¶25    BACH does not challenge these (and other) factual findings supporting the court's ultimate determination that Mihoubi reasonably relied on Hill's apparent authority in entering into the Operating Agreement. Indeed, while BACH makes numerous statements to the effect that Mihoubi "knew" about Hill's self-dealing, it makes no attempt to demonstrate that the court's findings to the contrary were clearly erroneous. Instead, BACH asks us to hold, based on its assertions that Mihoubi "knew" about Hill's "conflicting interest" and self-dealing in proposing to take a 25% interest in Royal, that the district court erred when it concluded that Mihoubi had no obligation to further investigate Hill's authority to enter into the transaction on BACH's behalf. We are not persuaded.

¶26    To begin with, the obligation determination BACH urges us to make in this case is premised on its own characterization of the facts surrounding Mihoubi's knowledge of Hill's conflicting interest. But because BACH has not challenged the court's clearly contrary findings on those issues, we are unable to accept the factual premise underlying its request. *See Glew*, 2007 UT 56, ¶ 18 (explaining that, where the district court "act[s] as the fact-finder in [a] bench trial" and makes findings to support its apparent authority conclusions, "[w]e will not disturb the court's findings of fact unless they are clearly erroneous"); *R.B. v. L.B.*,

2014 UT App 270, ¶ 26, 339 P.3d 137 (explaining that an appellant "bears the heavy burden of demonstrating that [a] finding is clearly erroneous"). *See generally Grimm v. DxNA LLC*, 2018 UT App 115, ¶¶ 15–17, 427 P.3d 571 (rejecting the appellant's clear error argument where the appellant did "not discuss the evidence supporting [the court's] findings but instead focuse[d] on the evidence most favorable to its position").

¶27 Moreover, BACH has not otherwise persuaded us that reversal is appropriate under the significantly deferential standard of review we are obliged to apply to the district court's apparent authority determination. *See Glew*, 2007 UT 56, ¶ 19. BACH has not shown—given the particular variety of facts and circumstances found by the court that BACH authorized Hill to enter into the Operating Agreement on its behalf and that Mihoubi had no knowledge of facts drawing Hill's authority into question—that the court erred when it applied those (and other salient) facts and circumstances to conclude that Hill had apparent authority and that Mihoubi had no obligation to further investigate Hill's authority in the manner BACH urges.[7] While BACH cites authority for the general proposition that an agent cannot bind a principal in circumstances where the third party *knows* the agent lacks authority, BACH cites no authority with circumstances comparable to the unique circumstances here. And BACH does not otherwise provide a cognizable legal basis from which we could make the determination it seeks about Mihoubi's obligation to further investigate Hill's authority.

---

7. For example, BACH suggests that we hold Mihoubi was required to investigate whether BACH's board had voted to approve Hill's interest in the Operating Agreement. But in doing so, BACH overlooks the fact-intensive nature of this inquiry and the combination of facts on which the district court relied to conclude that Mihoubi's reliance was reasonable under all the circumstances. *See supra* ¶¶ 21–25.

¶28    For these reasons, BACH has not demonstrated that the district court erred in concluding that Hill had apparent authority to enter into the Operating Agreement on BACH's behalf.[8]

B.    The Damages Decisions

¶29    BACH raises several challenges to various aspects of the district court's damages decisions. As set out above, during phase two of the case, the jury heard FranCounsel's claim for breach of the Operating Agreement. The jury found that BACH had breached the agreement and awarded $100,000 in damages. BACH then filed the JNOV, arguing that the evidence was insufficient to support the damages award, which the court denied.

¶30    On appeal, BACH raises three challenges to the verdict and the district court's resolution of the damages issue. First, BACH claims that the court erred by allowing FranCounsel's breach of contract claim to be tried because FranCounsel did not comply with the requirement under rule 26 of the Utah Rules of Civil Procedure to disclose a calculation of its damages in its initial disclosures or supplemental discovery. Second, BACH argues that the court erred by allowing FranCounsel's damages to be based on the value of its capital contribution to Royal

---

8. BACH also challenges the district court's alternative conclusion that Hill had actual authority to enter into the Operating Agreement on behalf of BACH. However, as with the court's apparent authority conclusion, BACH has not persuaded us that the court's actual authority conclusion was wrong. In any event, we have affirmed the court's apparent authority determination, and affirmance on that issue is sufficient to uphold the enforceability of the Operating Agreement. *See Grazer v. Jones*, 2012 UT 58, ¶¶ 9–13, 289 P.3d 437 (explaining that an agent may bind a principal to a transaction through either actual or apparent authority).

because under applicable law, BACH, as a member of Royal, is not liable to reimburse FranCounsel, another member of Royal, for its capital contribution. Finally, BACH challenges the sufficiency of the evidence supporting the damages award, arguing that the court erred by denying the JNOV and that there was no basis in the evidence to support the fact of damages or the amount. We address each issue below, ultimately affirming the district court's damages decisions and the verdict.[9]

1.      Disclosure of Damages Under Rule 26

¶31    BACH first argues that the district court erred in allowing FranCounsel's breach of the Operating Agreement claim to be tried because FranCounsel failed to adequately disclose its damages under rule 26 of the Utah Rules of Civil Procedure. BACH contends that the damages FranCounsel identified in its initial disclosures were "incomplete" where it "merely

---

9. BACH also challenges the district court's decision to instruct the jury that FranCounsel "may recover the value of the services it provided" in reliance on the promises encapsulated in the Operating Agreement, arguing that the instruction was improper because the court excluded evidence of the actual value of services offered by FranCounsel. We review a court's jury instruction decision for correctness, and we will "affirm when the instructions taken as a whole fairly instruct the jury on the law applicable to the case." *Paulos v. Covenant Transport Inc.*, 2004 UT App 35, ¶ 10, 86 P.3d 752 (cleaned up). Here, we discern no error in the court's decision to so instruct the jury. During trial, FranCounsel argued that it had fully performed under the Operating Agreement by providing services toward achieving international franchising and that due to BACH's breach of the Operating Agreement, it was entitled to the value of its own performance—which the parties contractually agreed had a value of $500,000. The court therefore did not err in instructing the jury that FranCounsel could recover the value of services it provided in reliance on the Operating Agreement.

provid[ed] a round figure of $500,000 . . . , without a computation as to how it arrived at this value," as representative of the in-kind contribution of its services. In this respect, BACH asserts that FranCounsel did not disclose "how that value was calculated, derived or that it related [to] any work actually performed."

¶32   Rule 26 of the Utah Rules of Civil Procedure, which governs disclosures during discovery, requires a party, "without waiting for a discovery request," to serve certain initial disclosures on the other parties. Utah R. Civ. P. 26(a)(1). A "computation of any damages claimed and a copy of all discoverable documents or evidentiary material on which such computation is based, including materials about the nature and extent of injuries suffered," is one of the required disclosures. *Id.* R. 26(a)(1)(C). In this respect, this court has explained that "even if a plaintiff cannot complete its computation of damages before future events take place, the fact of damages and the method for calculating the amount of damages must be apparent in initial disclosures." *Williams v. Anderson*, 2017 UT App 91, ¶ 18, 400 P.3d 1071 (cleaned up).

¶33   In its counterclaims, FranCounsel alleged that BACH had breached the Operating Agreement and that, as a result of BACH's breach, FranCounsel had lost the value of its capital contribution. In its initial disclosures, FranCounsel identified, as an element of its damages, "Lost capital investment in Royal: $500,000." BACH moved for summary judgment on FranCounsel's counterclaims, arguing that it had failed to, among other things, provide "any calculation of damages." FranCounsel opposed the motion, arguing that the parties contractually agreed to the value of its in-kind contribution at $500,000, that FranCounsel claimed this amount in its initial disclosures, and that the Operating Agreement had "been produced in discovery and authenticated in depositions." FranCounsel pointed out that "BACH and FranCounsel freely contracted for [the $500,000 figure] based on their own negotiations and experience" and that "[s]ince the value of

FranCounsel's services is stipulated to be $500,000, the contract itself is adequate evidence of damages." Accordingly, FranCounsel contended that it was "not required to establish some kind of formal calculation for the stipulated value of its services in the Operating Agreement because BACH . . . already agreed to that amount."

¶34  The court denied BACH's motion on the issue of whether FranCounsel adequately disclosed its damages, concluding that BACH had not demonstrated that it was entitled to judgment as a matter of law. Noting that FranCounsel "never supplemented" its initial disclosure on the computation of damages or "designated any expert to support" its theories of damages, following additional briefing, the court determined that FranCounsel's only "possible remedy is that stated within the four corners of the Operating Agreement—i.e., return of its expressly stated $500,000 capital contribution." Because the parties contractually agreed to $500,000 as the value of FranCounsel's in-kind contribution, the court concluded that FranCounsel was not required to make further disclosures to support a damages theory based on that value.

¶35  On appeal, BACH relies heavily on this court's decision in *Sleepy Holdings LLC v. Mountain West Title*, 2016 UT App 62, 370 P.3d 963, to support its argument of error. In that case, we affirmed the district court's conclusion that Sleepy Holdings' initial damages disclosures were inadequate under rule 26.[10] *Id.* ¶¶ 16–18. Among other things, although Sleepy Holdings described a lost sale in its complaint, it did not "identify the failed sale as damages" or further "offer a computation or method of calculating the damages," as required by rule 26. *Id.* ¶ 17. It also "did not supplement its disclosures within the discovery period." *Id.* ¶ 18. BACH argues that like the appellant

---

10. *Sleepy Holdings* applies an earlier version of the discovery rules, but the applicable disclosure requirement has not changed.

in *Sleepy Holdings*, FranCounsel failed to comply with rule 26 when it merely disclosed the "perfectly round number of $500,000" as damages and did not supplement that disclosure.

¶36 However, our decision in *Sleepy Holdings* is factually distinguishable from the present case. While FranCounsel did not supplement its initial disclosures, unlike the appellant in *Sleepy Holdings*, FranCounsel identified the lost capital contribution consisting of in-kind services as damages in its counterclaim and in its initial disclosures, and it provided the Operating Agreement itself as a basis for damages early in the litigation.

¶37 Moreover, the $500,000 damages figure required no computation. FranCounsel's theory was that the figure represented the entire value of its in-kind contribution to the parties' venture as agreed to by the parties in the Operating Agreement. *Cf. Williams*, 2017 UT App 91, ¶¶ 17–22 (concluding that a damages disclosure, where the claim to damages was to be based on a "fixed percentage" of the price paid for the business at issue, was sufficient under rule 26's computation of damages requirement (cleaned up)). Because FranCounsel purported to seek that full amount as damages for breach of the Operating Agreement, no further disclosure was needed. Accordingly, the district court did not abuse its discretion by concluding that FranCounsel's damages disclosures were sufficient under rule 26's damages disclosure requirement.

2.      Return of FranCounsel's Capital Contribution

¶38 BACH next contends that the district court erred in rejecting its argument that, as a matter of law, BACH could not be liable to FranCounsel for the value of its capital contribution under the breach of contract theory FranCounsel advanced. Characterizing FranCounsel's damages theory as a request for a return or reimbursement of its capital contribution to Royal, BACH asserts that, as a member of Royal, it cannot be liable to FranCounsel for the reimbursement of FranCounsel's in-kind

contribution to Royal. Rather, BACH contends that FranCounsel could seek return or reimbursement of its capital contribution only from Royal itself, not from a member of Royal.

¶39   In the district court's partial denial of BACH's summary judgment motion on FranCounsel's' counterclaims, the court ruled that FranCounsel's "claim relating to the value of its in-kind contribution . . . survives [the] Motion, but only to the extent [FranCounsel] may rely upon the contractually agreed-upon figure of $500,000 as its damages," noting that "[t]he issue will need to be fully briefed before that claim may proceed to trial." Accordingly, the court ordered the parties to "separately brief" before trial "the proper measure of damages on [FranCounsel's] claims and whether it may rely on [the Operating Agreement's contribution] provision or was required to make a more detailed showing."

¶40   Following that briefing, the court ruled that FranCounsel could measure its damages according to "the value of its stated capital contribution" as provided in the Operating Agreement. As to whether FranCounsel was legally barred from recovering the capital contribution, the court found BACH's argument that "one member of a limited liability company was not required to reimburse another for a debt obligation or other liability of the LLC" unavailing. (Cleaned up.) Noting that BACH appeared to be arguing that one member of an LLC cannot be personally liable to reimburse another member's capital contribution and that the Operating Agreement precluded such reimbursement, the court concluded that FranCounsel was "not seeking reimbursement of the capital contribution, *per se*." Rather, the court explained that FranCounsel sought "its damages associated with BACH's alleged breach," which the court concluded could be based on and measured by the agreed-upon value of its performance as stated in the Operating Agreement.

¶41   BACH has not persuaded us that the court's ruling in allowing FranCounsel to proceed to trial on a damages theory based on the value of its capital contribution to Royal was in

error. The court determined that FranCounsel was not seeking reimbursement of its capital contribution from BACH, but rather damages based on the services it provided in reliance on the Operating Agreement, as measured by the contribution value stated in the agreement itself. BACH does not acknowledge or address this determination, and it does not explain how the court's decision to allow the damages theory to go forward was wrong, given this determination. Instead, BACH argues this issue on appeal as though FranCounsel was indeed seeking reimbursement or return of its capital contribution from BACH as opposed to merely relying on the agreed value of FranCounsel's performance as set forth in the Operating Agreement to measure the damages flowing from BACH's breach.

¶42    Furthermore, our review of the record suggests that, as the district court determined, FranCounsel was not seeking reimbursement of its capital contribution from BACH. Rather, FranCounsel sought the value of the work it performed in developing BACH's product, and it relied on the contribution provision in the Operating Agreement as evidence of that value.

¶43    For example, in its trial brief regarding damages, FranCounsel explained that it sought the value of its capital contribution to Royal as damages for BACH's breach, which it claimed represented the value of services it provided in the venture. Likewise, at trial, FranCounsel argued to the jury that it was seeking to recover from BACH the value of its work and services, performed in reliance on the Operating Agreement, to develop BACH's brand internationally—an amount it argued the parties themselves valued in the Operating Agreement as $500,000.

¶44    In this respect, the authority on which BACH relies to argue for error on this ground is not persuasive. BACH cites case law, statutes, and various Operating Agreement provisions to argue that BACH cannot be liable to FranCounsel for the return of its capital contribution. But such authority does not address

the actual issue decided by the district court—whether FranCounsel could rely on the agreed-upon value of its services, as provided in the Operating Agreement, to measure and prove the damages it suffered due to BACH's breach of the Operating Agreement. Accordingly, we are not persuaded that reversal on this issue is appropriate.

3.      The Sufficiency of the Evidence Supporting the Award

¶45    BACH also claims that the damages verdict cannot be sustained on the evidence. Contending that there was no basis in the evidence supporting the fact or amount of the $100,000 in damages awarded to FranCounsel for reliance on the Operating Agreement, BACH asserts that the court erred by failing to grant the JNOV.[11]

¶46    Following the jury trial, BACH filed the JNOV, arguing, as it does on appeal, that the damages award was the product of speculation and that there was insufficient evidence supporting the fact or the amount of the $100,000 award. The district court denied the motion because it concluded that BACH had "failed to meet its burden of demonstrating that insufficient evidence supported the verdict." Specifically, the court noted that the judgment notwithstanding the verdict standard required BACH

---

11. As it did in the JNOV, BACH makes a number of arguments regarding the damages verdict and the lack of evidence supporting it. For example, BACH argues on appeal that there was no rational basis in the evidence to support the award, no evidence of the fact of damages, and no evidence of the amount of damages. However, having included these arguments in the JNOV, the operative ruling on appeal addressing these arguments and the sufficiency of the evidence supporting the jury's damages award is the court's denial of the JNOV. Accordingly, we address and resolve all BACH's sufficiency arguments through our analysis of the district court's JNOV ruling.

to show that there was "no competent evidence" to support the verdict, taking into account "all reasonable inferences in a light most favorable to the nonmoving party." (Cleaned up.) The court then stated that BACH failed to meet this burden—that it failed to cite the record presented to the jury, to acknowledge the evidence potentially supporting the jury's verdict, or to explain how, despite the evidence presented, the jury could not have reached the verdict it did.

¶47    A district court "may grant a JNOV motion only if there is no basis in the evidence, including reasonable inferences which could be drawn therefrom, to support the jury's determination." *ASC Utah Inc. v. Wolf Mountain Resorts LC*, 2013 UT 24, ¶ 18, 309 P.3d 201 (cleaned up); *DeBry v. Cascade Enters.*, 879 P.2d 1353, 1359 (Utah 1994) ("A directed verdict and a judgment n.o.v. are justified only if, after looking at the evidence and all reasonable inferences in a light most favorable to the nonmoving party, the trial court concludes that there is no competent evidence which would support a verdict in his favor. A motion should be denied if reasonable persons could reach differing conclusions on the issue in controversy." (cleaned up)). Our review on appeal is similar: "On a motion for judgment notwithstanding the verdict, we will reverse the trial court's ruling only if, viewing the evidence in the light most favorable to the prevailing party, we conclude that the evidence is insufficient to support the verdict." *Pinney v. Carrera*, 2019 UT App 12, ¶ 33, 438 P.3d 902 (cleaned up), *aff'd*, 2020 UT 43.

¶48    Here, BACH does not acknowledge the district court's reasoning in the JNOV denial, nor does it attempt to explain why the court was wrong in ruling that BACH failed to carry its burden to show it was entitled to have the verdict set aside. BACH cannot persuade us that reversal is appropriate without acknowledging the district court's decision and dealing with its reasoning. *See, e.g., Living Rivers v. Executive Dir. of the Utah Dep't of Envtl. Quality*, 2017 UT 64, ¶¶ 41–43, 50–51, 417 P.3d 57 (discussing that an appellant's burden requires "timely" explaining to the appellate court why the lower tribunal was

wrong, and declining to reach the "important questions" implicated in the case because of the appellant's failure to do so); *Federated Cap. Corp. v. Shaw*, 2018 UT App 120, ¶ 20, 428 P.3d 12 (explaining that an appellant who "does not meaningfully engage with the district court's reasoning" necessarily "falls short of demonstrating any error on the part of the district court"); *Duchesne Land LC v. Division of Consumer Prot.*, 2011 UT App 153, ¶ 8, 257 P.3d 441 ("Because [the appellants] have not addressed the actual basis for the district court's ruling, they have failed to persuade us that the district court's ruling constituted error . . . ."); *Golden Meadows Props. LC v. Strand*, 2010 UT App 257, ¶ 17, 241 P.3d 375 (explaining that when a party "fails to attack the district court's reasons" for a decision, the party "cannot demonstrate that the district court erred" with respect to that decision). Stated another way, to persuade us that reversal of the JNOV denial is appropriate, BACH must at least persuade us that the court was wrong in its assessment of BACH's briefing failures for the original motion. BACH has not done so. Accordingly, we cannot set aside the jury's verdict on this basis.

## II. The Cross-Appeal

¶49 In their cross-appeal, Appellees argue that the district court erred by denying their request for approximately $230,000 in attorney fees. "In Utah, attorney fees are awardable only if authorized by statute or by contract." *Federated Cap. Corp. v. Haner*, 2015 UT App 132, ¶ 11, 351 P.3d 816 (cleaned up).

¶50 Appellees moved for an award of attorney fees, arguing to the district court that both the Operating Agreement and the License Agreement contained provisions entitling them to their requested fees. More specifically, Appellees pointed to an indemnification provision in each agreement that they claimed required an award of attorney fees. The Operating Agreement contained a provision entitled "Indemnification by Member," which provides,

> Any Member who is in violation of this Operating Agreement agrees to indemnify and hold the Company and the Other Members harmless from all costs and expenses, including reasonable attorneys' fees . . . and court costs, incurred by the Company and/or Other Members as a result of the violation of this Operating Agreement. The Company shall fund the indemnification obligations provided herein in such a manner and to such extent as the Members may from time to time deem proper.

Appellees argued that they were entitled to fees under this provision because BACH was a member of Royal as defined by this provision and a jury in phase two of the case had found in their favor, determining that BACH had violated the Operating Agreement.

¶51 Similarly, Appellees pointed to the Indemnification provision in the License Agreement as the contractual basis for an award of attorney fees. It provides,

> Licensor . . . agrees to indemnify and hold harmless the Licensee and its members, directors, officers, employees, affiliates, agents and assigns from and against any and all claims, suits, damages, attorney fees, cost, expenses and losses of Licensee directly or indirectly, as a result of, or based upon or arising from any inaccuracy in or breach or nonperformance of any of the representations, warranties, covenants or agreements made by Licensor in or pursuant to this Agreement (whether or not of a material nature) and/or damages or liability resulting from or arising out of a claim that Licensee's use of the Licensed Mark infringes the trademark rights of any third party. However, Licensor shall not be liable to indemnify

the Licensee if the claims, suits, damages, attorney fees, cost, expenses and losses are caused by Licensee's gross negligence or willful misconduct or by Licensee's material breach of this Agreement.

Appellees argued that they were entitled to attorney fees under this provision because a "central issue" in BACH's complaint was Hill's lack of authority to execute the License Agreement, which was resolved in Appellees' favor during phase one of the case, pointing to another provision in the agreement representing and warranting that Hill had authorization to execute and enter into the agreement on BACH's behalf.[12] On this basis, Appellees contended that BACH's complaint was "based upon" or arose from a representation and warranty in the License Agreement, thus triggering the indemnification clause's provision for attorney fees.

¶52 The district court denied Appellees' request for attorney fees, concluding that neither agreement had fees provisions entitling Appellees to their requested fees. Noting that contractual fees are available "only in strict accordance with the terms of the contract," the court determined that there was "nothing in either the Operating Agreement or the License Agreement that indicates a meeting of the minds whereby

---

12. The authorization provision Appellees cited provides,

> Harold J. Hill as President/CEO, has full corporate, power and authority and has taken all corporate actions and has obtained all necessary approvals or authorizations from any other third party and government authority to represent BACH and to execute and perform this Agreement, which will not constitute or result in a violation of any enforceable and effective laws or former agreements.

BACH agreed to pay the fees and costs in the event of a dispute with [Royal] or FranCounsel." (Cleaned up.)

¶53　Regarding the Operating Agreement, the court focused on the second sentence of the indemnification provision, which provides that Royal would fund the indemnification obligations, concluding that the plain language demonstrated that only Royal would be liable for fees, not a member such as a BACH. For the License Agreement, the court first determined that the plain language of the provision "does not *clearly reflect* an agreement for fees between the parties." The court next focused on the language stating that indemnification applied to "any inaccuracy in or breach or nonperformance of" the License Agreement, determining that "that issue has never been determined by this Court, and was never presented to the jury." The court noted that during the phase-one bench trial, the court merely held that the License Agreement was enforceable but did not determine whether a breach of that agreement occurred. And in the second phase, the jury determined only that the Operating Agreement had been violated, not that the License Agreement had. The court further determined that, to the extent the two provisions at issue were indemnification provisions, Appellees "never ever asserted an indemnification claim" and were thereby barred from asserting one post-trial.

¶54　In their opening brief, Appellees summarily contend, without reference to the record or to relevant authority, that the district court erred in its interpretation of the indemnification provisions. And to support their contention, Appellees, by their own admission, duplicate for us the briefing from their motion before the district court. Appellees do not attempt to address the district court's decision and reasoning until their reply brief. Even then, much of Appellees' argument focuses on disproving BACH's arguments in opposition, not the court's reasoning and decision.

¶55　We therefore cannot grant Appellees the relief they seek. The district court denied Appellees' motion in a well-reasoned,

written ruling. Appellees, by their own admission, did not address the district court's reasoning and explain why it was wrong in their opening brief. Rather, in their opening brief, Appellees essentially argued the merits of their request for attorney fees as though the district court had not considered the issue. But appeals are not do-overs. They are opportunities to correct error. *See State v. Thornton*, 2017 UT 9, ¶ 49, 391 P.3d 1016 ("American courts have long followed the writ of error approach to appellate review. Under this framework, the appellate court does not review the trial record in a search for an idealized paradigm of justice. We ask only whether the trial court committed a reversible error in resolving a question presented for its determination." (cleaned up)). And Appellees cannot persuade us that the district court erred without addressing the district court's decision on its own terms. *See, e.g., Living Rivers v. Executive Dir. of the Utah Dep't of Envtl. Quality*, 2017 UT 64, ¶¶ 41–43, 50–51, 417 P.3d 57; *Federated Cap. Corp. v. Shaw*, 2018 UT App 120, ¶ 20, 428 P.3d 12 (explaining that an appellant who "does not meaningfully engage with the district court's reasoning" necessarily "falls short of demonstrating any error on the part of the district court").[13]

---

13. And this failure is not saved by Appellees' belated attempt to grapple with the district court's reasoning in their reply brief, especially because the timing of the attempt rendered BACH unable to respond to these new arguments. *See Allen v. Friel*, 2008 UT 56, ¶ 8, 194 P.3d 903 (stating that issues not raised in the opening brief are considered waived, and explaining that a reply brief is limited to addressing matters raised in the opposing brief due to "considerations of fairness," because "[i]f new issues could be raised in a reply brief, the appellee would have no opportunity to respond to those arguments"); *Martin v. Kristensen*, 2019 UT App 127, ¶ 61, 450 P.3d 66 (explaining that the "failure to engage with the court's reasoning until the reply brief is fatal"), *cert. granted*, 456 P.3d 386 (Utah 2019); *Bahnmaier v. Northern Utah Healthcare Corp.*, 2017 UT App 105, ¶ 11 n.2, 402

(continued…)

CONCLUSION

¶56    Regarding BACH's appeal, we affirm the district court's conclusion that the Operating Agreement was valid and enforceable. We likewise affirm the various challenged determinations regarding damages. As to Appellees' cross-appeal, we affirm the district court's decision not to award attorney fees.

––––––––––

(…continued)
P.3d 796 (stating that because the appellant "made no attempt to challenge the district court's reasoning for rejecting" one of her claims "in her opening brief [on appeal], . . . we do not address the court's ruling in that regard").